UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,    )
                             )    8:18-cr-205-WFJ-TGW
        PLAINTIFF,           )    Tampa
                             )    March 13, 2020
        v.                   )    9:07 a.m.
                             )
JORDAN RODRIGUEZ, ET AL.,    )
                             )
        DEFENDANTS.          )

TRANSCRIPT OF SENTENCING HEARING
OF RAYMY ESCOTO AND PHILLIP USCANGA
BEFORE THE HONORABLE WILLIAM F. JUNG
UNITED STATES DISTRICT JUDGE

Court Reporter:            Tracey Aurelio, CRR, RMR, RDR
                           Federal Official Court Reporter
                           801 N. Florida Avenue, 15th Floor
                           Tampa, Florida 33602
                           (813) 301-5448

        Proceedings recorded by mechanical stenography,
transcript produced by computer.

1    APPEARANCES:

2    For the Government:
         MR. CHRISTOPHER MURRAY
3        United States Attorney's Office
         Suite 3200
4        400 N. Tampa Street
         Tampa, FL 33602-4798
5
     For Defendant Escoto:
6        MR. WILLIAM SANSONE
         Sansone Law, PA
7        609 W. De Leon Street
         Tampa, FL 33606-2719
8
     For Defendant Uscanga:
9        MR. JASON M. MAYBERRY
         The Mayberry Law Firm, LLC
10       3630 W. Kennedy Boulevard
         Tampa, FL 33609
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

_____

   (Proceedings commenced at 9:07 a.m.)

        THE COURT:  Good morning.  Let's call the case,
please.

        THE COURTROOM DEPUTY:  Yes, Your Honor.  United
States v. Raymy Escoto, Case Number 8:18-cr-205.

        Would counsel state their appearances.

        MR. MURRAY:  Chris Murray for the United States.
Good morning, Your Honor.  And I'm joined by Special Agent
Melinda Sears.

        THE COURT:  Thank you.

        MR. SANSONE:  Good morning, Your Honor.  Bill Sansone
on behalf of Mr. Raymy Escoto who is here.

        THE COURT:  Well, good morning.  Thank you.  And I
have received on Mr. Escoto's behalf I think two pleadings; is
that correct?

        MR. SANSONE:  That is correct, Your Honor.

        THE COURT:  Yes.  I thought they were very well done,
by the way.  And as you know, I put out really for discussion
purposes Docket 444, which was a sentencing -- titled
"Sentencing Memorandum."  And that was based upon my review of
my trial notes.  And I appreciate Mr. Sansone filing, we will
call it objections on those, and then there is also a
sentencing memorandum which I have read carefully.  So thank
you.

1          All right.  So let me get to my right page.  So let's

2   swear in Mr. Escoto, please.

3          THE COURTROOM DEPUTY:  Yes, Your Honor.

4      (Defendant Escoto sworn.)

5          THE COURTROOM DEPUTY:  Please state your name for the

6   record.

7          DEFENDANT ESCOTO:  Raymy Antonio Escoto.

8          THE COURTROOM DEPUTY:  Thank you.  Please be seated.

9          THE COURT:  Thank you.

10          Mr. Escoto, in September you entered a plea of guilty

11   to Count 1 of a superseding indictment.  And that charged you

12   with arson of a red Mustang, in violation of Title 18

13   U.S. Code 844.  I previously accepted your guilty plea and

14   adjudged you guilty of that offense.  So we are here at the

15   sentencing stage now.

16          I have to ask you just a couple of questions.  Have

17   you read and reviewed the pre-sentence report with your

18   lawyer, Mr. Sansone?

19          DEFENDANT ESCOTO:  Yes, sir.

20          THE COURT:  All right.  And are you satisfied with

21   his work for you to date?

22          DEFENDANT ESCOTO:  Yes, sir.

23          THE COURT:  Is there anything you wanted him to do

24   that he has failed to do?

25          DEFENDANT ESCOTO:  No, sir.

1          THE COURT:  All right.  Thank you.

2          So let me ask both Mr. Sansone and Mr. Escoto, I'm

3     turning to the pre-sentence report.  And we want to nail down

4     and resolve any objections by paragraph to facts or numerical

5     calculations.

6          So Mr. Sansone, give me any objections you have by

7     paragraph.  And this is Docket 485 which was filed on

8     Valentine's Day, February 14.

9          MR. SANSONE:  Your Honor, I believe we only have one

10    factual objection.  Your Honor, Paragraph 61.

11         THE COURT:  Let me get to it.  Okay.  Sixty-one.  And

12    the entire paragraph?  Give me the exact --

13         MR. SANSONE:  The relevant facts -- and this also was

14    encompassed in the Court sentencing memorandum, and I objected

15    to three facts but essentially two.  If you look at the

16    highlighted "Raymy Escoto," it says, "was in the rear of the

17    vehicle" -- that is the red Mustang -- "during the drive-by

18    shooting."

19         And the next time it says "Raymy Escoto" in bold,

20    "went to Jordan Rodriguez's house where they met Jordan, Juan

21    to get weapons and ammunition and then made a plan."

22         Essentially, Your Honor, Mr. Escoto's position has

23    always been that he was dropped off prior to the drive-by.  He

24    lives within blocks -- he lives three blocks from the Tellez

25    house and then was picked up after.  And he did knowingly burn

1  the car that was in the drive-by shooting, but he did not --
2  was not in the rear during the time of it, supply a gun, or
3  was at Jordan's house.  Those facts are the only thing we
4  object to.  And everything else --
5        THE COURT:  All the other calculations?
6        MR. SANSONE:  Correct.
7        THE COURT:  Okay.  Let's talk about that for a
8  minute.  So one thing I think the government will agree with
9  is there was -- maybe they won't -- there was a fight at the
10 quickie mart.  Now, this paragraph suggests that Mr. Escoto
11 was in the rear of the vehicle when they followed the rivals
12 to the home of Julio Tellez.
13       Mr. Murray, that's not right, is it?  He wasn't --
14 Mr. Escoto was not at the quickie mart.
15       MR. MURRAY:  You are correct, Your Honor.  He was not
16 at the quickie mart.  We agree with that.
17       THE COURT:  And when they went from the quickie mart
18 to Julio's house, this man was not in that red Mustang.
19       MR. MURRAY:  That's correct, Your Honor.
20       THE COURT:  All right.  So we do need to correct
21 that.  And there's an exhibit in evidence with the red Mustang
22 headed to Julio's house, and it's only got two guys in it.
23       MR. MURRAY:  Correct, Your Honor.
24       THE COURT:  So on that line, I'm going to say,
25 "Uscanga drove a Ford Mustang with JCM in the passenger seat."

Okay?  So we do not have Mr. Escoto leaving the quickie mart
on that trip down to Tellez's house.  So I noticed that.

All right.  Now, it's probably clarified four lines
down where it says, "After seeing their rivals go to
Mr. Tellez's home, the juvenile and Phillip picked up Raymy."

Now, back to Mr. Sansone.  What are you saying
happened?  You are saying that these two young men went to
Mr. Tellez's house.  And then when do they pick up Mr. Escoto?

MR. SANSONE:  They picked up Mr. Escoto after that.
This is before the shooting.  Mr. Escoto got in the back seat
of the car.  They drove back to the quickie mart and actually
watched the video of the fight with the owner.  They drove
back down 5th Avenue.  Mr. Escoto is in the back of the car,
and I think there's a pole camera shot of him in the back of
the car that was taken at 12:44.

THE COURT:  Yeah.

MR. SANSONE:  At that point from that photograph,
Your Honor, to Mr. Escoto's house is 30 to maybe 60 seconds.
I've driven it.  Our position is Johnny Cintron had a gun.
Mr. Escoto got dropped off at his home, which is 60 seconds
from that photograph.  Everything that happened in this case
was within blocks of each other.

At that point, Phillip and Mr. Cintron go to Jordan's
house, whatever happened at Jordan's house, there's the
drive-by shooting at the Tellez house, and then Phillip and

Johnny Cintron come and pick up Mr. Escoto who lives probably

five blocks from the Tellez house.

DEFENDANT ESCOTO: Right around the corner.

MR. SANSONE: Not even five blocks from the Tellez

house. And then after that, they all find out not that there

was just a shooting but someone had been killed. They panic

and purposefully burned the red Mustang, which was one of the

cars that was used in the drive-by shooting.

THE COURT: So they do the shooting at Mr. Tellez's

house and then swing by and pick up Mr. Escoto after that?

MR. SANSONE: Correct, Your Honor.

THE COURT: All right. So --

MR. SANSONE: And I'm sorry, Your Honor. And that

was Mr. Escoto's position from the very beginning. Obviously,

as I think Your Honor knows, that from the beginning of this

case up until a couple weeks before trial, the government's

position --

THE COURT: I know the juvie lied and said that

Mr. Escoto did the shooting and he didn't.

Other than your telling me that, do you have any --

it's not your burden, but do you have any evidence to offer

me --

MR. SANSONE: Well --

THE COURT: -- on that point, because I think it's a

pretty important point if your client wasn't in the car when

they shot and killed -- they shot Juan Montoya in the head

twice and then shot Mr. Tellez twice and killed him.  Any

other evidence?

        MR. SANSONE:  I mean, I can't --

        THE COURT:  You either do or you don't.  It's real

simple.

        MR. SANSONE:  I can't call a co-defendant, Your

Honor.

        THE COURT:  Say that again.

        MR. SANSONE:  I was saying I can't call a

co-defendant.

        THE COURT:  Well, who are you talking about?

        MR. SANSONE:  My understanding --

        THE COURT:  Mr. Uscanga would say that?

        MR. SANSONE:  He was not in the vehicle at the time

of the shooting.  Mr. Uscanga.  That's my understanding, Your

Honor.  I have not directly spoken to him.

        THE COURT:  Now, wouldn't we see that car on the pole

camera?  First we saw it empty.  And then we saw it -- and

I've got the picture right here.  And you can always tell

because you have the green cast on the hand and it's a red

Mustang.  A direct route between Rodriguez's house and

Mr. Tellez's house, there should be a pole camera -- now they

have two in it again going back.

        MR. SANSONE:  From the -- the closest route, and I'm

telling you this from personal experience because I drove from house to house and I timed it with a stopwatch.  The direct route from Jordan Rodriguez's house to the Tellez house does not go by that pole camera, Your Honor.  If there is another one -- there might be another one, but it does not go by the pole camera that Your Honor has an exhibit of.

THE COURT:  Let me hear from the government on this point.  It's pretty central to this man's culpability what he's saying.  What says the government?  I was here at trial. The trial testimony was contrary to this point in two instances.  The juvenile, Johnny, testified.  He's not exactly the world's greatest witness.  Also the gentleman whose name escapes me at Mr. Tellez's house that was not shot, the other gentleman who may have brought the rifle said he thought there was more than two people in the red Mustang.

All right.  I will hear from the government on this point, which I think is pretty central to, you know, everything.

MR. MURRAY:  Yes, Your Honor.  It's our position that Mr. Escoto was in the Mustang during the shooting of Mr. Tellez.  We based that not just on the information provided by Johnny Cintron Malave but also by Ever Deleon and Eliceo Santoyo.

THE COURT:  Who is that second name?

MR. MURRAY:  Ever Deleon, Your Honor.

1          THE COURT:  Which one is that?

2          MR. MURRAY:  He did not testify, but he was another

3   witness that was interviewed in this investigation.  And if it

4   would be helpful to the Court, I could call Special Agent

5   Sears to summarize those proffers.

6          THE COURT:  Who was he with?

7          MR. MURRAY:  He is -- he was someone who was a victim

8   at one point.

9          THE COURT:  He was at Mr. Tellez's house?

10          MR. MURRAY:  He was nearby, Your Honor.  He was not

11   at Mr. Tellez's house.

12          THE COURT:  All right.  Well, let my ask you this:

13   You gave this man a 5K.  Didn't you debrief him?  Didn't you

14   interview him before you gave him a 5K?

15          MR. MURRAY:  We did, Your Honor.

16          THE COURT:  This defendant.  Was it pursuant to a

17   proffer agreement?

18          MR. MURRAY:  Yes, Your Honor.

19          THE COURT:  Do you have that proffer agreement handy?

20   What does the proffer agreement say as to if he maintains a

21   contrary position?  Or did he always -- well, I don't want to

22   invade if there is some immunity here, but usually the proffer

23   says if you say something different --

24          MR. MURRAY:  This has been consistent throughout as

25   Mr. Sansone indicated.  So that's --

1          THE COURT:  Okay.  All right.  Okay.

2          MR. SANSONE:  Your Honor, I did want to clarify one

3     thing, Your Honor.  You had asked me if there was any

4     evidence.  The only thing that I would have as to evidence --

5     and it slipped my mind -- is actually a police report from the

6     town of Longboat Key who interviewed Mr. Ever Deleon the day

7     of the shooting.  His in-laws lived across the street.  He was

8     grilling out.  And he specifically stated that he saw two

9     Hispanic males in the red Mustang at the time of the shooting,

10    which we know is Phillip Uscanga and Johnny Cintron.  I have a

11    copy of that, and I was prepared through Agent Sears.

12         THE COURT:  And I don't want to limit the

13    government's case, but so with this -- what's the name?

14    Mr. Leon?

15         MR. SANSONE:  Deleon.

16         THE COURT:  We have a police report that says two.

17    And I'm just trying to get right to the meat of the coconut

18    and accept the proffer.  And Deleon told Special Agent Sears

19    three.

20         MR. MURRAY:  He's never said three, Your Honor.  He

21    has said two, but his physical description of the other person

22    he saw is consistent with the description of Mr. Escoto.  And

23    he also took law enforcement to Mr. Escoto's home as the

24    person that he saw in that car.

25         THE COURT:  Well, he would have been in the back.

Didn't they run the top up when the shooting happened?

        MR. MURRAY:  I think so, Your Honor.

        THE COURT:  The top was up.

        Okay.  Well, so everything else is -- I'm going to reserve on that factual objection.  Everything else is without objection.  And we are going to reserve on that point right now.

        Mr. Murray, I need to direct your attention to the pre-sentence report, please.  And tell me if the government has any objections factually or numerically.

        MR. MURRAY:  No, Your Honor.  No objections.

        THE COURT:  All right.  I appreciate that.  So with that one factual point, which I'm reserving on for the time being, which would not affect the guidelines, I adopt the -- and remember I corrected the one line, and we definitely -- everyone agrees that he did not leave the quickie mart in the red Mustang.  He was not present at the fight.  So I find that the advisory guidelines are as stated in the PSR, which is a total offense level of 12, criminal history category of IV. That would be a minimum mandatory -- the guideline range is actually below that, but it's a five-year minimum mandatory. So it is a minimum mandatory -- 60-month imprisonment is the advisory guideline range.  There's a one to three years of supervised release.  There is no restitution.  Well, restitution to be determined.  We will have to talk about that

1  in a minute, I guess.  Well, we don't have any claims from the

2  rental company or whoever owned the car, right?

3          MR. MURRAY:  That's correct, Your Honor.  I think the

4  original rental car company went out of business.  And we have

5  not received any subsequent claim.

6          THE COURT:  All their inventory burned up.

7          MR. MURRAY:  Yes, Your Honor.

8          THE COURT:  So there is no restitution because the

9  crime is arson.  And what was -- well, the crime he pled to

10  was arson.  So the restitution -- there has been no claim from

11  the Mustang owner.  There's a fine range, which I will waive,

12  but for the record there'll be no -- this gentleman doesn't

13  have any money for a fine, but the fine is from $5,000 to

14  $55,000, and a $100 special assessment.

15          All right.  So what I would ask now is if there's any

16  victims present or victim's representatives, we will hear from

17  them.  And of course, then we will hear from the government

18  for anything they wish to present.

19          MR. MURRAY:  Thank you, your Honor.

20          Alma Tellez would like to speak on behalf of the

21  victim's family.

22          THE COURT:  Thank you very much, Ms. Tellez.  We

23  would be very pleased to hear from you.

24          THE WITNESS:  Good morning, Your Honor.

25          THE COURT:  Good morning.

THE WITNESS:  So as I hear what they mentioned or state what happened, it just doesn't make any sense how is it that he was conveniently dropped off but then picked up?  Why would he get dropped off and then picked up?  They went there -- they went to our place where we resided, they went there with a plan.  They knew what they were going to do.  So it's not fair for that to be thrown out, conveniently he was dropped off and then picked up.  Doesn't make any sense.  Why would he get dropped off?  Why?  Because he didn't want to be involved?  But he was quick to go burn the car?  No.  It makes no sense at all.  And it's not right that my brother's life was taken because of something they decided to do.

So I ask -- I ask you, Your Honor, that you give the highest, what the maximum is that you could possibly give, because it's not right.  It makes no sense at all.  Conveniently he was dropped off and then picked up again but was quick to go burn that car to destroy all the evidence.  No.  No.  There's no way.

And that's all I have to say.  Thank you.

THE COURT:  Thank you very much.  I appreciate you coming in and giving me those comments.  Thank you very much, ma'am.

All right.  Any other victims?  Government, you have the floor.

MR. MURRAY:  No other victims, Your Honor.

1        THE COURT:  All right.  I will hear from the

2   government.  What -- did you have a low end term in this plea

3   agreement?  I don't recall.

4        MR. MURRAY:  I don't believe we did, Your Honor, but

5   we are asking for 60 months, Your Honor.  It's a tough -- this

6   is a tough case, tough decision, but we were looking at the

7   relative culpability of what Mr. Cintron Malave ultimately

8   received combining his two sentences.

9        THE COURT:  I know, but he got the big whack because

10  he obstructed justice.

11       MR. MURRAY:  Yes, Your Honor.

12       THE COURT:  Okay.

13       MR. MURRAY:  So it's kind of -- we are weighing that,

14  Your Honor, that he was -- Mr. Cintron Malave was more

15  culpable than this defendant, but it's a very difficult

16  decision, but we think that given his role in the conspiracy,

17  his relative culpability, we do recommend 60 months, Your

18  Honor.

19       THE COURT:  So back to the factual issue which I

20  haven't resolved.  The evidence that you are offering is at

21  trial, which was Cintron's testimony, and the fellow at the

22  house that said he thought there was more than two or could

23  have been or was or something, and this other gentleman who

24  described -- who said two to Longboat PD but then described

25  Mr. Escoto and took them to the house.  Any other evidence of

1  that?

2         Did we have a picture of the red Mustang, you know,

3  immediately before the Tellez shooting, or did it go from

4  Rodriguez's house a different way, not past the pole camera?

5         MR. MURRAY:  I don't believe we did, Your Honor.  We

6  are looking at the West 30th camera, Your Honor.  Eight

7  minutes before the fight, the West 30th traffic camera

8  showed --

9         THE COURT:  The fight or the shooting?

10        MR. MURRAY:  I'm sorry.  The shooting.  It showed

11 three occupants in the Mustang.

12        THE COURT:  That's the one where you can see the

13 green cast.  And you can see Mr. Escoto in the back kind of

14 with his arms spread.

15        MR. MURRAY:  Yes, Your Honor.  I believe that's at

16 12:44.

17        THE COURT:  But this car is not going to the Tellez

18 house.  This car is going the other way.

19        MR. MURRAY:  Correct, Your Honor.

20        THE COURT:  Right?  Back -- going -- headed to

21 Jordan's house.

22        MR. MURRAY:  Correct, Your Honor.

23        THE COURT:  So we do not have another picture of the

24 red car, or Jordan's car for that matter, heading that way

25 with this pole camera to do the shooting.

1      MR. MURRAY:  That's correct, Your Honor.

2      THE COURT:  So plainly the two cars then went the

3 other way to Tellez's house.

4      MR. MURRAY:  That's the only explanation that makes

5 sense, Your Honor.

6      THE COURT:  Okay.  What else do you have?

7      MR. MURRAY:  I think that's it, Your Honor.  And we

8 have the Ever Deleon statement that Your Honor talked about,

9 Eliceo Santoyo who is the witness you referenced, Your Honor,

10 and then the testimony of Johnny Cintron Malave.

11      THE COURT:  Okay.  Thank you.  Is that it for the

12 government or for any victim?

13      MR. MURRAY:  Yes, Your Honor.

14      THE COURT:  So Mr. Sansone, you have the floor for --

15 I'm still reserving on this, but the little squirrel in the

16 back of my head is spinning wheels as we speak.

17      I will hear from you, anything you wish to present.

18 Now, Mr. Escoto can address the Court if he wants.  If he

19 chooses not to, he is not penalized in any way.  Okay.  You

20 have the floor.

21      MR. SANSONE:  Your Honor, just very briefly as to the

22 Ever Deleon statement.  He is a Spanish speaker.  And I hired

23 my own Spanish-speaking translator to walk through his

24 recorded testimony with me because it was confusing.  And my

25 understanding of listening to it, Mr. Deleon lived at the same

apartment complex as Mr. Escoto and knew that red Mustang had

been there and had seen Mr. Escoto in that red Mustang before.

So when he was talking to law enforcement, he knew

the people that were involved and owned and drove that red

Mustang.  One of them was Mr. Escoto.  It wasn't my

understanding that he said Mr. Escoto was in the car when it

drove by, but he did take law enforcement to his own apartment

complex where Mr. Escoto lived and Mr. Deleon had actually

seen the red Mustang there.

It's a confusing translation.  That's why I got

somebody to listen to it because I did not understand what the

agent was saying.  So I had somebody tell me exactly what

Mr. Deleon was saying.  Now, that's my understanding of maybe

some of the confusion.  That was my understanding from the

person I had hired is that's what Mr. Deleon was referring to.

That said, Your Honor, my sentencing memorandum, some

of the enhancements -- let me just say this, Your Honor:

Mr. Escoto clearly understands that if this Court feels that

under the arson guideline, which we think applies and I

believe that probation thinks applies because the cross

reference doesn't apply, if this Court feels that the

two-level enhancement for concealing another offense is not

sufficient because of the nature of what he did, concealing

another offense, this Court clearly has the power to enhance

him on that.  The only thing we were objecting to would be if

1  this Court was going to enhance him on these other

2  involvement.

3        But essentially, Judge, I want to focus on Mr. Escoto

4  himself.  You've heard about the facts and you were at the

5  trial and Mr. Escoto's name came up, but you don't know

6  Mr. Escoto.

7        I have gotten to know Mr. Escoto very well in the

8  past 21 months going through this.  When I first met

9  Mr. Escoto, he was indicted for being a shooter in a drive-by

10 shooting and he was facing a mandatory life in prison.  And

11 like a lot of my clients, he said, I wasn't a shooter, and we

12 spent many months going through that.

13       And during those months, Your Honor, Mr. Escoto -- I

14 saw a change in him for a number of reasons.  One is he

15 sobered up.  His mind became clear.  And he was no longer

16 smoking pot, taking Xanax, all these bad things that he was

17 doing.

18       And another thing, Your Honor, is his faith -- a lot

19 of people find faith in jail.  I know there's a saying there

20 aren't any atheists in foxholes, but Mr. Escoto's faith was

21 different in the sense that a lot of times when we would talk,

22 we would talk just about his faith and how the truth would

23 come out and how he was leading a terrible life.  And

24 regardless of the facts of this case, he was doing drugs,

25 hanging out in a trap house where prostitution was going on.

1  And he had kids and he wasn't being a good father, and we

2  talked a lot about that.  He -- not an excuse but an

3  explanation, he was sexually abused by a neighbor when he was

4  a young child, 14 years old.  Not too long after that, he

5  attempted suicide by slitting his own throat.  This is when he

6  was 14.  Not long after that he got in trouble for a burglary

7  and ended up violating and going into prison, and hence began

8  his life.  He didn't learn from that experience.  He got out

9  and was still ripping and running.

10          This experience where he literally -- as he told me

11  many times, the government doesn't lose RICO cases.  He was

12  staring down the barrel of a mandatory life sentence and he

13  thought that's what was going to happen.  And through that

14  all, he said many times, maybe this happened for a reason.

15  And he was centered and had a peace about him, and we talked a

16  lot about that.

17          And so the time that he also spent in custody, Your

18  Honor -- I want Your Honor to take this into consideration --

19  wasn't just normal jail time where, oh, he sat in for

20  20 months.  Mr. Escoto -- now the government agrees -- was

21  facing a mandatory life sentence for something he did not do,

22  something that the government said he did do, which was shoot

23  on that day.  And we all agree that he did not do that.

24          For a number of months he was in solitary

25  confinement, which is 23 hours in a cell.  And that experience

of -- I think it was over five months he sat in solitary

confinement facing a RICO charge, he began to change.  He has

always regretted his actions.  And he can't take those back.

The only thing he can do is move forward.  He is willing to

accept any sentence that this Court hands down.  He

understands the need for punishment.

      The only thing I ask, Your Honor, is based on his

personal history, I know the facts and circumstances of the

actual case Your Honor is going to essentially hold in

advisement, but for the deterrence of criminal conduct, future

criminal conduct and the need to protect the public, I do not

feel that a long-term prison sentence is needed to protect the

public or deter future criminal conduct knowing full well that

Mr. Escoto has been to prison before and got out and he's

sitting here before Your Honor.  What's different this time?

      He was a kid then facing a short period of

incarceration.  And as Your Honor well knows, sometimes that's

not enough, coming into federal court facing a lifetime

sentence, sitting in solitary confinement.  Many times I met

with Mr. Escoto and he just openly wept.  He knows he put

himself in this position.  No one else did.  He did.

      We do not believe based on the circumstance -- the

Court's Document 420 -- that a lot of the enhancements do not

apply if limited to the conduct that he pled to.  I just want

to let the Court know that Mr. Escoto does understand that the

1  guidelines might not reflect the seriousness of what he agrees

2  he did do.  And if this Court wants to enhance him based on

3  that, he fully accepts that.

4       And I think Mr. Escoto can maybe speak to his

5  personal situation better than I do, but what I have said,

6  Your Honor, is clearly outlined in my sentencing memorandum.

7  And I know this Court has considered that.  And we would ask

8  for a guideline sentence.  But if this Court feels that

9  enhancement is appropriate, an enhancement that doesn't lead

10 to an excessive amount of incarceration time.  And he is also

11 aware that he is going to go out on supervised release and

12 have to leave Oneco and start a new life or he will be back

13 here.

14       He would like to address the Court.  And three family

15 members would also.

16       THE COURT:  Thank you.  Any manner you wish to do it

17 is fine.  Thank you.  You can just sit right there.  Raymy,

18 just pull that mic up.  That's easier.

19       DEFENDANT ESCOTO:  Well, Your Honor, I'm going to

20 start by just reading a letter that I wrote to you and to

21 everybody listening.  And then off of that, I will go off a

22 little bit into what just comes.

23       Your Honor, I would like to start out this letter by

24 apologizing to the community for my actions.  I was

25 irresponsible and careless for doing what I did.  Your Honor,

1  during this period of my incarceration I have had plenty of

2  time to think over my actions and the mistakes that I have

3  made.  Your Honor, I have tried my best to make this

4  experience of my incarceration a learning experience and not

5  let it affect me or impact me in a negative form.  I took

6  every class that was available to me, such as parenting class,

7  motivation for a change, CPR classes, and even did my own

8  studies such as Bible study and prayer circles.

9        Your Honor, being separated from my children for so

10 long has been such a heavy burden on me.  And not only on me

11 but on them too because they need their father out there to

12 raise them and to care for them.  I want to stress that the

13 point of this letter is not to somehow justify my wrongdoings

14 but to show you that I am truly sorry, that I regret the

15 things that I have done in my past.  But if granted a second

16 chance, all I will strive to be is a better person, more

17 productive member of society, and most importantly be a better

18 man for my family and be a better, more mature father for my

19 beautiful children who need me there in the most important

20 stage of their life, which is their youth.

21       And, you know, Your Honor, just being incarcerated

22 for however long I was incarcerated -- really I lost track

23 already -- but facing all that time, maintaining my innocence

24 and, you know, having faith that eventually the truth was

25 going to come to the light, and it did.  You know, being in

here has been such an eye opener.  Words don't even explain

the things that I have been through, the things that I have

sat here and thought about.  I almost lost my life for

stupidness, for hanging around the wrong people, being around

the wrong crowd, being blinded by drugs, just -- and you know,

I just want to also refer to anybody who is listening in this

court.  I apologize for everything that you are going through.

You know, you got this picture of me that I'm just

this criminal, I'm just this bad person.  You know, I'm human.

I made a mistake.  I own up to my mistake.  I truly apologize.

And I just want to apologize to the Tellez family for what

they are going through right now.  It was never my intentions

anything to happen.  You know, they can believe what they want

to believe.  I let my lawyer argue the facts because that's

his job, but I truly want you to believe and know that I

had -- I was -- I'm sorry.  I wasn't there.

THE COURT:  So we know Johnny Cintron shot at the

Tellez house.  Who was driving the red Mustang?

DEFENDANT ESCOTO:  Mr. Phillip Uscanga, sir.

THE COURT:  Sorry.  Go ahead.

DEFENDANT ESCOTO:  Otherwise, Your Honor, you know, I

sincerely apologize.  You know, I fully accept whatever you

hand down to me.  And I can only take it from what you give

me, make the best out of it and keep moving forward and be

productive, don't let this be a setback because this is not

going to hold me back.  I'm going to be somebody special in
life.  And I'm going to do it the right way.  I'm not going to
sit here and consume drugs.  I'm not going to sit here and do
any of that because I see the lifestyle that it led me to
live.  And that's not a lifestyle that this family, this
beautiful family behind me ever raised me to be.  You know, so
I'm not only letting myself down, I let them down more than
anything.  And that's, you know, that's hurtful because they
didn't raise me like that at all.  At all.

My grandmother is sitting in the stage, and she means
everything to me.  My grandfather wasn't able to make it
because he is old, and the traveling and the virus and all
this outspread that's going on but, you know, they mean
everything to me.  My family means everything to me.  And I
promise you with a second granted chance, Your Honor, I'm
going to do what's right.

THE COURT:  I appreciate those comments.  Thank you.

DEFENDANT ESCOTO:  Thank you, sir.

MR. SANSONE:  There are three family members that
would like to address you very briefly.

THE COURT:  Of course.  They can talk right into that
mic up front.

Talk right into that mic.  Thank you.

THE WITNESS:  Hi.

THE COURT:  Hello.

1    THE WITNESS:  Can you hear me?

2    THE COURT:  Yes.  Give us your name and speak -- pull

3 that thing right to you.  Thank you.

4    THE WITNESS:  My name is Karen Alvarez.

5    THE COURT:  Go ahead, Karen.  Thank you.

6    THE WITNESS:  I am the mother of his first child,

7 Cataleya.  I have known him for six years now, about to be

8 seven.  My daughter hasn't had him in her life for about two,

9 almost two years now.  And I mean, she only hears his voice

10 over the phone right now and it's a little hard.  And, you

11 know, it is very difficult on me because, no, we're not

12 together, but I am a single mom, and it's really hard without

13 having other help, especially from her actual father figure.

14 She does have my dad, which she kind of sees that he's

15 probably her dad, but she -- you know, I let her know that's

16 grandpa.  I just need you to know that my daughter, she needs

17 him.  I have had my dad my whole life, and I don't know where

18 I would be without him.  And I can't imagine my daughter --

19 sorry.  It's really hard.

20    THE COURT:  Take your time.

21    THE WITNESS:  I don't only think about her.  I think

22 about his other kids too.  I would have to because they are

23 her siblings, and I can't imagine how hard it must be for him

24 to feel as well.  And I really hope that my daughter can have

25 him in her life present and doing right, helping me with

anything financial, emotionally, everything, me and my
daughter.  That's the most important thing I wanted to tell
you.

THE COURT:  Thank you.  Thank you very much.  I
appreciate your comments.

THE WITNESS:  Thank you.

THE COURT:  All right.

THE WITNESS:  Good morning, Judge.

THE COURT:  Good morning.  Thank you.

THE WITNESS:  My name is Anatalia Escoto.  I'm sorry.

I am Raymy's aunt.  I want to let the Court know that
we are supporting Raymy getting this matter solved and put in
the past.  I mean, he has made mistakes, but he is also regret
of them.  He is a good person, not because he is my nephew.  I
know him since he was really young.  We've been apart for so
many years.  We used to live in North Carolina.  And his
mother moved here.  When he was younger, he was living with me
for a couple of years.  He was going to school with my kids.
He is a good person.  He loves his kids.  He come from family.
We are a good family.  Some kids, they just hang with the
wrong crowd.  Sometimes there is nothing we can do.  As a
parent, tell them don't hang out with this.  They are still
going to do it.  And at the end they know it was a bad choice.
But I'm sure Raymy, he regrets everything that been past his
life.  He has kids now.  And I think he would love to be with

them.

My mom is here too.  This is the first time that we -- I didn't even know how to act.  For me and my family this is the first time we come to court and deal with this kind of stuff.  He knows he need to make a lot of effort.  He knows he is good for it.  He is going to change his life for to better him.  And I know he is going to do good, look forward.  And please give him an opportunity to be with his family.

Thank you, Your Honor.

THE COURT:  Thank you very much.

THE WITNESS:  Can you hear me?

THE COURT:  Yes, ma'am.  Thank you.

THE WITNESS:  Good morning, Judge.  My name is Natalie Nunez, and I am Raymy's younger cousin.  I would just like to familiarize the Court today on the type of person that Raymy is.  I know you have a pretty good idea, but me as a cousin who grew up with him, who was with him in school, who not only grew up with him in school but also we were raised together before.  Like my mother -- that's my mom.  Like my mother said, we were separated because he moved to Florida and we were still in North Carolina.  But until then, like I was saying, we were raised together.  And I just want you to know that Raymy is the most family-oriented person, honestly, out of all of us.  It doesn't matter what kind of day he is

having.  He is worried about everybody else's feelings.  He's

been through the worst the past couple of years.  And right

through that door you see the biggest smile on his face

because he knows that what he has done is wrong.  But no

matter what, when he sees our family he has the biggest smile

to let us know that it's all going to be okay.  He is super

regretful for his mistakes.  And you can tell by the way he

talks to you on the phone, the little 15 minutes that we have,

you can tell that the only thing he cares about is getting

back to his family and just growing as a man, not only for --

not only for me, his cousin, but for my grandma and the four

kids that he has.

Sorry.  I just -- I just feel like -- I feel like

Raymy knows what he's done.  And I know that he's super

regretful and he has been working on becoming a better person,

incarcerated, and I truly believe that he has changed.  And I

just hope you give him a chance, not just for him but for my

family.  Thank you.

THE COURT:  Thank you very much.  I appreciate those

comments.

All right.  What else, Mr. Sansone?  What else do you

have?

THE WITNESS:  Excuse me.  I wanted to see if I could

speak on behalf of my brother.

THE COURT:  Mr. Sansone, what else do you have, sir?

1    MR. SANSONE:  I think one more family member wants to

2    speak.

3        THE WITNESS:  Hello.

4        THE COURT:  Hi.  Talk right in that and give us your

5    name, please.  You can pull that to you a little bit.  Okay.

6    Thank you.

7        THE WITNESS:  My name is Ashley Ramos, and I am Raymy

8    Escoto's little sister.  And I just wanted to speak on my

9    brother on an amazing person he is.  My mom does have four

10   children, but it's always just been Raymy, the older one, me,

11   the middle child, and my younger brother, Randy.  And not only

12   is he just an amazing person as a family, me and my little

13   brother never really had a father figure growing up.  And

14   Raymy was always the one who kept our family together,

15   laughing, always taught us everything we knew.

16       Bad intentions as anybody sees why he is here for,

17   charges that are outstanding, crazy, but Raymy is an amazing

18   guy.  He not only taught us everything we knew from riding a

19   bike when we were little, but he also taught us how to respect

20   people, how to properly, like, how can I say, carry ourselves.

21   He have always tried to keep my little brother in the right

22   path when he was able to because -- and myself because growing

23   up it was hard in the streets.  Everybody -- like my aunt

24   says, they tried to teach us when we were young to do right

25   from wrong, and we are just the rebel ones that think it's

cool to hang out with our friends. And Raymy was always the
one who tried to keep us in track and make sure the whole
family was always smiling through bumps in the roads that we
would have. He would just keep our family happy.

And honestly, I believe everybody always deserves a
second chance. Things happen for a reason. People do not
know why, but it leads to misunderstandings and situations
where we can't get out of. And everybody has this picture of
my brother as him being a gang member or a drug dealer person
bad for the streets when, honestly, if you go to Bradenton and
ask about Raymy, everybody knows him as a good person, always
helping out people, always smiling. He was never in a bad
mood. He was always a happy camper. Like, no matter what
situation happen, he would always try to uplift people and
make -- even though he was going through a lot, he would
always make sure everybody was going through happy phases.

And one thing that does break our hearts is that even
though he does have four children, he always wanted to be
there for his kids, especially his one only son that he has
and three daughters, because his father was never really there
for him. The only father figure he actually has is my
grandparents. And when my mom separated us from New Jersey
and we moved over here, it kind of was difficult for him not
having a father figure around, with just having a mother when
a mother can only do so much for their child.

He -- I could say he's just, like, an amazing person.
It's been stressful not having my brother home for a lot of
reasons, not only for myself being the only girl and having
two brothers being raised with, but Raymy, he's an amazing
person.  Like when you are depressed or sad or anything, you
could always count on him to put a smile on your face even if
it's from a letter or a phone call from jail.  He has always
been that bright spiritual person among everybody.

And his troublemaking of being incarcerated did
affect a lot of people, not just family, because he has a lot
of loving friends out there that consider him as family.  You
could go to the corner store and until this day I get asked,
how's your brother doing?  I hope he is doing fine.  He's such
an amazing person.  He was always smiling.  I hope he is doing
good.

I just hope that even though everything he went -- he
did or whatever may have caused him to be incarcerated here
right now, he learned from it and be out with us as soon as
whatever this goes, how this situation goes because I don't
know how feds work through normal charges, but I just hope
when he gets home it's better for everybody.  And I genuinely
think he is going to make sure his kids go through a better
path than what we went through growing up and what himself
went through growing up.  He is just an amazing person for
everybody.  And that's about it.

1    THE COURT:  Well, thank you very much.

2    THE WITNESS:  You're welcome.

3    THE COURT:  Thank you for those comments.

4    What else, Mr. Sansone?

5    MR. SANSONE:  Nothing further, Your Honor.

6    THE COURT:  Does that conclude the defense

7    presentation?

8    MR. SANSONE:  Yes, Your Honor.

9    THE COURT:  So the record on Mr. Escoto's sentencing

10   is closed, and we will take no more argument or evidence, with

11   two things remaining.  I need to make a factual finding on

12   that paragraph, and then we need to sentence Mr. Escoto.

13   So I'm going to take that under advisement, and we

14   are all going to sit right here and we are going to call out

15   Mr. Uscanga, and we are going to start on his sentencing right

16   now.  Okay?  So let's everybody just be seated.

17   Now, we are going to move right into Mr. Uscanga's

18   sentencing.  I'm not saying you can't leave if you want to,

19   but we are now calling Mr. Uscanga's case.  So let's bring him

20   out.  And Mr. Mayberry is here.  You all can sit in the second

21   row.  Just stay seated.

22   THE MARSHAL:  Did you want them both out at the same

23   time?

24   THE COURT:  Yes, if that's all right.

25   Just have a seat.  Mr. Mayberry, just stay in the

second row.  You're good.

Again, I didn't mean people can't leave or go to the restroom or whatever, but we are going to keep rolling here.

Let's call that second case, Ms. Olden.

THE COURTROOM DEPUTY:  Yes, Your Honor.

United States v. Phillip Uscanga, Case Number 8:18-cr-205.

Would counsel please state their appearances.

MR. MURRAY:  Chris Murray for the United States.  Good morning again, Your Honor.

MR. MAYBERRY:  Good morning, Your Honor.  Jason Mayberry on behalf of Phillip Uscanga.  Your Honor, my client is present sitting to my right.

THE COURT:  Thank you very much.  Let's swear in Mr. Uscanga, please.

THE COURTROOM DEPUTY:  If you could please raise your right hand, Mr. Uscanga.

THE COURT:  That's good.

(Defendant Uscanga sworn.)

THE COURTROOM DEPUTY:  Please state your name for the record.

DEFENDANT USCANGA:  Phillip Uscanga.

THE COURT:  Thank you, Phillip.

Mr. Uscanga, in September you entered a plea of guilty to Count 7 of the superseding indictment charging you

with arson.  I previously accepted your guilty plea.  So we
are here for your sentencing.

I have to ask you a couple questions.  Have you had
enough time to go over the pre-sentence report with
Mr. Mayberry and prepare with him for this sentencing?

DEFENDANT USCANGA:  Yes, sir.

THE COURT:  And are you satisfied with his services
to date?

DEFENDANT USCANGA:  Yes, sir.

THE COURT:  Is there anything you have asked him to
do that he hasn't accomplished for you?

DEFENDANT USCANGA:  No, sir.

THE COURT:  All right.  Let me ask you and
Mr. Mayberry to focus on the PSR.  Let's focus right in.  And
what I'm trying to resolve are the factual objections to the
PSR either factually or numerically by paragraph.  So
Mr. Uscanga and Mr. Mayberry, if there are any objections,
focus me in on those.

MR. MAYBERRY:  Your Honor, I had made an objection
and sent it over to the United States Probation.  I would
object to Paragraph 62 through 64.

THE COURT:  All right.

MR. MAYBERRY:  Paragraph 137 and Paragraph 139.  And
the way that I styled my objection, Your Honor, is that I have
stated that I object to those paragraphs insofar as that

Mr. Uscanga knowingly went to Jordan Rodriguez's home for the purpose of retrieving a weapon or that he decided to or had knowledge that the purpose of driving to the Tellez home was to shoot at the home, draw anyone outside secondary to any shooting, or had knowledge that anyone would drive behind the vehicle driven by Mr. Uscanga with the intention of shooting a gun at the Tellez home or the occupants therein.

We have not disputed anything with respect to the arson. We have pled to that charge. Our -- I guess our factual objections are similar to what Mr. Sansone has made in that the objections are really with respect to knowledge of a shooting or knowledge that a shooting was going to occur.

THE COURT: So factually what should I write down did occur that your client -- we know he was at the quickie mart and he assisted the juvenile when the juvenile was fighting. He picked him up, and then at a high rate of speed he followed the van and enabled the van to be positioned so that the juvenile could throw a bottle into the van and hit the lady driving. That's on video. So then they drove. They followed the van to Mr. Tellez's house. That's also on video.

MR. MAYBERRY: Yes, Your Honor.

THE COURT: So then they came back to Mr. Rodriguez's house. What do you want me to say? That -- because I need some facts here -- that Mr. Uscanga just had no idea why they were with guns in hands driving to Mr. Tellez's house the

second time, or what's the facts?  Do you want me to just delete those and leave it as blank facts?  What are the facts?

MR. MAYBERRY:  Your Honor, our position is that he took Johnny Cintron to the Tellez home in anticipation that Johnny Cintron was going to fight or continue the fight that started at the quickie mart --

THE COURT:  Okay.

MR. MAYBERRY:  -- having no affirmative knowledge that he had a gun or that he was going to use the gun.  And there is grand jury testimony that I have reviewed that we did get produced to us.  It's protected.  I don't know if that's lifted.  If Your Honor would like to hear from me sidebar, I can address that.

THE COURT:  No.  I want to hear about it.

MR. MAYBERRY:  John Cintron testified at a grand jury -- for the grand jury on Thursday, April 12, 2018.  He was questioned by Ms. Adams, "What happened when you, Phillip, Raymy, Jordan, and Macho met up with Jesse, Christian, Kiki, and their friends in Taum Sauk's (phonetic) car?

"We headed towards the house that the kids were at" -- meaning going to the Tellez home.

She says, "Okay.  With what purpose?"

Cintron responds, "On purpose to fight."

Ms. Adams, says:

"QUESTION:  Purpose to fight?"

His response, "Yeah."

"QUESTION:  And when you say you
headed there to fight, what specifically did
you mean?

"ANSWER:  We were there.  We were on
our way to fight them," he responds.

"QUESTION:  Okay.  What was the plan
once you got there?

Now, this is where and we maintained -- I think that
when Mr. Cintron had originally proffered to the government up
and until the point where he changed course, he was
essentially -- when he was accusing Mr. Escoto of being the
shooter in this vehicle, he was essentially taking Mr. Escoto
and inserting him for his own conduct.  His answer:

"ANSWER:  Raymy just started shooting
and it turned into something else.  And then
they started shooting also."

So the reason that I cite that to Your Honor is I
believe that that is supportive of the intent going over there
was to meet up and fight.  And then at some point someone
starts shooting, and at that point --

THE COURT:  And it just so happened there were two
cars that started shooting.  Jordan was behind and he shot
also.  That's what happened.  I mean, that's the fact.  I
mean, we know there were two cars.

1    MR. MAYBERRY:  We are not disputing the fact that

2  Jordan --

3       THE COURT:  So what paragraphs are those?  You are

4  basically saying that you drove the red Mustang over there but

5  had no idea anyone was going to shoot?

6       DEFENDANT ESCOTO:  Yes, sir.

7       THE COURT:  I was talking to your lawyer.  I'm sorry.

8       MR. MAYBERRY:  Yes, Your Honor.  That's the position

9  that we have submitted.

10      THE COURT:  You are going to hop out and start

11 fisticuffing.

12      MR. MAYBERRY:  That's what happened at the quickie

13 mart, Your Honor.  So that was --

14      THE COURT:  That's what happened at the quickie mart.

15 All right.  Well, do you have any position on whether

16 Mr. Escoto was in the car when you all drove over the second

17 time to fight when Johnny pulled out the gun?  Was Mr. Escoto

18 in the car?  That's also in these facts.  What's Mr. Uscanga's

19 position on that set of facts in this paragraph?

20 Mr. Mayberry, I'm asking you.

21      MR. MAYBERRY:  He's maintained that Mr. Escoto wasn't

22 in the car, that it was John Cintron's brother.

23      THE COURT:  It was Christian Cintron.  So there were

24 three people in the car.

25      MR. MAYBERRY:  That's what he believes.

1    THE COURT:  Well, he was there.  So that's what

2  you're telling me.  So you say it was Christian Cintron that

3  was in the car.  There were three people at the Tellez

4  shooting in the red Mustang.  That third person was Christian

5  Cintron.

6    MR. MAYBERRY:  That's my client's recollection.

7    THE COURT:  Okay.  So what paragraphs are those?

8    MR. MAYBERRY:  Give me one second, Your Honor.

9    THE COURT:  That's the first time I've heard about

10  that, about that being Christian Cintron.

11    MR. MAYBERRY:  Your Honor, that would be the grand

12  jury transcript of John Cintron.  The date is Thursday,

13  April 12.

14    THE COURT:  I'm sorry.  Give me the paragraphs again

15  on your objections.  Sixty-two?

16    MR. MAYBERRY:  I'm sorry.  The objection paragraphs?

17  The PSR?

18    THE COURT:  Yes.

19    MR. MAYBERRY:  We objected to 62 through 64.

20    THE COURT:  Okay.  Hold on.  Sixty-two.  So the first

21  paragraph, on January 1, there was a fight.  Okay.  That's

22  okay.

23    The next line, Uscanga drove a Mustang with the

24  juvenile in the passenger seat and Mr. Escoto in the rear.

25  Okay.  We know that Mr. Escoto didn't leave the quickie mart.

Okay. So I'm going to just strike, "drove a Ford Mustang with juvenile in the passenger seat." Okay. And I'm going to delete that phrase, "and Raymy Escoto in the rear of the vehicle," because he wasn't there at the time. We know that. Everybody agrees on that.

So the group followed their rivals, who were in a gray minivan, to the home of Julio Tellez. You agree with that, correct?

MR. MAYBERRY: Correct.

THE COURT: After seeing their rivals go to the Julio Tellez home, the juvenile and Phillip picked up Raymy Escoto and went to Jordan Rodriguez's home where they met Jordan and Juan to get weapons and ammunition. Okay. So you disagree with that.

MR. MAYBERRY: I would object as to the purpose of him knowing they were there to pick up weapons and ammunition.

THE COURT: All right. And then the group decided to maintain and increase their position. You disagree with that, that they were going to drive by and shoot. There was never any plan to shoot.

MR. MAYBERRY: My client didn't have any plan to shoot, Your Honor. Yes.

THE COURT: Just thought it was going to be a fist fight.

MR. MAYBERRY: Correct.

1      THE COURT:  All right.  And then the people driving

2  there for the fist fight was the juvenile, was Johnny Cintron,

3  and Mr. Uscanga and Christian Cintron.  According to you,

4  there were three people in the Mustang, according to your

5  version of the facts; is that correct?

6      MR. MAYBERRY:  Yes, Your Honor.

7      THE COURT:  That's 62.  Now, what's the next

8  paragraph you object to?

9      MR. MAYBERRY:  I'm actually okay with that paragraph.

10  Sixty-three, we don't have any objection.

11      THE COURT:  So after 62, give me your next objection.

12      MR. MAYBERRY:  Withdraw the objection to 64 as well

13  because I don't think that flies in the face of what we are

14  saying.

15      We also objected to 137.

16      THE COURT:  137.  Okay.  The legal conclusion there.

17  Okay.

18      MR. MAYBERRY:  Yes, Your Honor.

19      THE COURT:  So on 137, I'll just say on that

20  objection I just overrule it because it's just a comment as to

21  the law.  All right.  Go ahead.  So that one is overruled.  I

22  have still reserved on the Paragraph 62.

23      MR. MAYBERRY:  And then 139.

24      THE COURT:  139.  Again, a legal objection.  I will

25  overrule that objection.  So any other paragraphs in the PSR?

1    MR. MAYBERRY:  Give me one moment, Your Honor,

2    because there was an objection that I had discussed with

3    probation that probation was going to do some things and they

4    ultimately did not.  So if you give me one moment.

5    No further objections, Your Honor.

6    THE COURT:  Again, on 62, so Mr. Uscanga who was

7    driving the Mustang, just so I have this correct, says there

8    were three people in that Mustang when the shots rang out at

9    Tellez's house; is that correct?

10    MR. MAYBERRY:  Yes, Your Honor.

11    THE COURT:  All right.  So then factually and

12    numerically, except for the legal issues in the later

13    paragraphs which I overruled, your objection relates to

14    Paragraph 62.

15    MR. MAYBERRY:  Yes, Your Honor.

16    THE COURT:  All right.  What says the government on

17    62?

18    MR. MURRAY:  Your Honor, we believe 62 is accurate.

19    If I understand Mr. Mayberry's objections, it's about

20    knowledge of what happened, not actually what happened.  But

21    factually he is in agreement that the two cars went by the

22    house.  Mr. Cintron Malave shoots first.  Then Jordan

23    Rodriguez comes by and shoots second.  So it's really a

24    conclusion.  We infer knowledge from facts.  I think all of

25    those facts show that clearly Mr. Uscanga had knowledge.

```
 1        There were inconsistent statements.  The Court is
 2   well aware of that, but what actually happened shows
 3   knowledge, Your Honor.  So I think his objection should be
 4   overruled based on the totality of the circumstances and the
 5   events as they were actually carried out by the defendants in
 6   this case.
 7        And as to Christian Cintron being in the car, Your
 8   Honor, we have never heard that from anyone else besides
 9   Mr. Uscanga.
10        THE COURT:  Did you hear that from him previously?
11        MR. MURRAY:  Yes, we did, Your Honor.
12        THE COURT:  All right.  And does the government have
13   any objections to any of the PSR calculations or paragraphs?
14        MR. MURRAY:  No, Your Honor.
15        THE COURT:  All right.  So I'm going to reserve for a
16   second on that Paragraph 62 which, as Mr. Mayberry knows, I
17   also did with Mr. Escoto.
18        So therefore, subject to that reservation as to the
19   factual statements and guideline applications, I adopt the
20   pre-sentence report with that one edit we made that shows that
21   Mr. Escoto was not in the car when it left the quickie mart at
22   the time of the fight.  So that's a total offense level of 12,
23   criminal history category of III, advisory guideline range,
24   which is the minimum mandatory on the arson of 60 months, one
25   to three years supervised release.  There is no restitution.
```

The fine range I waive.  There will be no fine, since the
defendant is not liquid, of $5,500 to $55,000.  That's waived,
and $100 special assessment.

All right.  So that's the same guideline range as
Mr. Escoto.  So I will hear from the government on any
presentation the government might have.

MR. MURRAY:  Thank you, Your Honor.  We also ask
again for 60 months as to this defendant.  It's the minimum
mandatory which is applicable in this case, but that's the
sentence we are seeking, Your Honor.  It is a serious offense,
but we do think his relative culpability to those who shot, we
do think it's a reasonable sentence of five years.

THE COURT:  Really?  Really?  Okay.  Well, isn't the
theory of your case that he drove war wagon Number 1 knowing
they were going to go down there and shoot up the house?

MR. MURRAY:  Yes, Your Honor.

THE COURT:  And that was -- there was evidence
sufficient to make that finding that we saw at trial, is there
not?

MR. MURRAY:  Yes, Your Honor.

THE COURT:  All right.  Now, the defense has the
floor, Mr. Mayberry, for anything that you wish to present,
and that would include Mr. Uscanga addressing the Court.  He
doesn't have to if he doesn't want to.  And he is not
penalized in any way if he chooses not to.  So you have the

floor.

MR. MAYBERRY:  Thank you, Your Honor.

Your Honor, I had filed similar documentation as to Mr. Sansone.

THE COURT:  Hold on.  Excuse me.  I jumped the gun. Sorry.  I'm very sorry.  I forgot to ask Mr. Murray if there are any victims present who wish to address the Court in Mr. Uscanga's case.

MR. MURRAY:  We believe Alma Tellez does not wish to readdress the Court, Your Honor.

THE COURT:  So there are none.  You are telling me there are none.

MR. MURRAY:  Correct, Your Honor.

THE COURT:  Sorry about that, Mr. Mayberry.  Now you have the floor.

MR. MAYBERRY:  Thank you, Your Honor.

Your Honor, I had filed a sentencing memorandum in this case.

THE COURT:  And I have read it.  I got four very nice letters, which I also read, and I read your objections.  And as you know, that sentencing memo at 444 I threw out there sort of for discussion purposes just to kind of shake facts out.

MR. MAYBERRY:  Yes, Your Honor.  And my filings, quite honestly, Your Honor, when those came through, when the

Court had filed the orders and also the sentencing memorandum,

in complete candor to the Court, I didn't know how to address

those because I had never seen anything like that before.

THE COURT: I didn't want to -- you know, there is

nothing worse than a judge who says -- you go in there and all

of a sudden you have all these issues that weren't disclosed

to you ahead of time. You know, forewarned and forearmed.

MR. MAYBERRY: I do appreciate the heads-up, Your

Honor.

In walking through the 3553(a) characteristics for

Mr. Uscanga, he did debrief to the government. We sat for

about two and a half hours where he told his side of the story

and he was rewarded with a 5K, much like his co-defendant,

Mr. Escoto, requesting a one-point departure.

Mr. Uscanga has one prior misdemeanor in his criminal

history. He grew up in the same location as all the rest of

these kids in Bradenton in a subsection of that called Oneco,

which Your Honor is familiar with after going through this

trial.

Throughout the discovery and throughout the

interviews that I have received and reviewed, there was

nothing that I saw that had any indicia of him making a claim

to a connection of a gang or any kind of organized crime.

That's not the case with many of these co-defendants.

I have cited several things within my sentencing

memorandum with respect to the misgivings of a person versus the overall goodwill. Mr. Uscanga in large part has lived his life as a law-abiding person. He has got I believe two juvenile cases, neither which are violent. He has got the one misdemeanor. He's got a tremendous support system here ready to speak on his behalf. His character is going to be displayed, I believe, when you speak with a lady named Barbara Lokonik. I also put a reference to a letter from a Jacqueline Morales, and there is another gentleman that is a neighbor that can talk to you about some of the selfless things that Mr. Uscanga does. Overall, I think the family will paint a very good picture of who they know him to be and who he truly is as a person.

Much like his co-defendant, Mr. Escoto, for the haul of this thing, he was staring down the barrel of a potentially very, very long sentence, ultimately a sentence where he could have been put in sentence for the rest of his life in a mandatory capacity. He never broke from his story. This is something that he has been telling me since May of 2018. That never broke. He said that to the government when he entered his proffer. His proffer was rewarded with a 5K1 motion based in part on what they believed to be --

THE COURT: So Johnny just -- was this a surprise? We get to Julio's house and Johnny's hiding a gun and he says, surprise, surprise? I'm not going to take a swing at these

gentlemen. I'm just going to open up.

MR. MAYBERRY: Your Honor, I think Johnny Cintron earlier that day when he got into the fight that he got into, I don't think that you could necessarily predict what Cintron was going to do.

THE COURT: It was just totally coincidental that like, you know, a hundred yards behind is Jordan with -- I don't know whether he used that mini Draco or not, but it was something that it wasn't a .22 revolver. So that's what I'm supposed to take to the bank, that Mr. Uscanga was just dumbfounded when Johnny emptied a clip into Mr. Tellez's house.

MR. MAYBERRY: Your Honor, that's partially corroborated by Mr. Cintron's grand jury testimony.

THE COURT: Well, the first one when he bought five years for lying, but okay. You are having me -- that's your story and you are sticking to it that when Mr. Cintron emptied that clip into Mr. Tellez's house, it was a surprise to Mr. Uscanga. Is that what you're telling me?

MR. MAYBERRY: I think so.

THE COURT: All right. Okay.

MR. MAYBERRY: Ultimately, Your Honor, the nature and circumstances of this person, his character has been good consistently over the course of his life. He has not always hung out with the right people. He has not always done the

right things, but in large part in comparison to those that
were indicted alongside of him, his criminal history and his
misgivings have not been on par. Obviously he's here in this
case because of things that he has done. He is very
remorseful for everything that he has done. And he is very
remorseful to the Tellez family for the loss of their loved
one.

He has entered an arson plea. There was a cooperator
in this case that lied for two and a half years approximately
to the federal government until he finally came off of that
lie. When that happened, he was offered this arson
resolution. He absolutely does not deny in any capacity his
role in the arson. He went there. They burned that car.
They knew that it was used the way that it was used. He did
that. He is remorseful for it. That has been accounted for,
I believe, Your Honor, appropriately in the guideline. He has
been enhanced because it is to cover up another crime. That
is what we are asking the Court to do is to sentence in
accordance with that guideline that probation has found that
we believe is appropriate everything considered.

This was never his fight. He didn't get out of the
car at the store and engage. Yes, he drove away. Yes, they
gave chase to the van, but this was John Cintron's fight. So
ultimately he is here before the Court having entered his plea
to be sentenced for the charge that he had knowledge of that

he committed. He's asking the Court to consider that. I have
addressed, I believe, everything that the Court had asked for
in my memorandum. If Your Honor wants me to go back through
those, I can.

THE COURT: No. And I thought it was excellent. The
quality of lawyering on both sides in this case has been very
high. So thank you.

MR. MAYBERRY: Thank you, Your Honor.

For two years he was staring down the barrel of this
RICO. He could have at any point done what so many do, which
is just roll over and say what he thinks somebody wants them
to hear. The government never asked him to come in and say
what we want you to say. That's not what I'm saying. But so
many people in cases where they're facing such a strenuous
sentence, they'll cave and they will just say what they think
that they need to say to get themselves a lesser or reduced
sentence, and that never happened here. That didn't happen
here even when he debriefed. The government listened to what
he had to say for two and a half hours, which is what we are
saying here today, and they rewarded him with a 5K1
substantial assistance motion.

John Cintron was indicted for obstruction of justice
for lying in just about the most horrific fashion I can
envision as an attorney. He accused another man of shooting a
gun that he shot. If he would lie about that, I don't think

1    there is anything that the kid would not lie about.

2           So we are here today, Your Honor, in consideration of

3    that.  I would ask Your Honor to impose a guideline sentence.

4    Sometimes when I write these memorandum I get a little nerdy

5    and I start looking at studies and statistics and recidivism

6    and deterrence and long prison sentence versus short prison

7    sentence, and I think I even put some things in here about the

8    neighborhood that he grew up in.

9           A longer prison term isn't going to be effective to

10   deter him from crime.  He has been in jail for two years.

11   He's not the same person that he was when he went in.  He

12   recognizes that he wasn't doing things the right way before he

13   went in.  He's ready to get out and do things the right way

14   now.

15          A longer prison sentence or a prison sentence in

16   general doesn't deter, doesn't cease someone to go back and do

17   something else again.  Again, it doesn't curb recidivism.  He

18   wants to make a change.  He wants to get away from where he

19   grew up, get away from the people that were surrounding him.

20   He's got the support system to do that.  They are lined

21   through this back row.  You are going to hear from I believe

22   six or seven of them, if Your Honor will hear it.  And I think

23   that you will get a good understanding of who he is over and

24   above what he appears to be on the drab black and white piece

25   of paper that is an indictment.

I would ask Your Honor to impose a guideline sentence as calculated. We are not asking for a variance. We feel like the 3553(a) factors support a guideline sentence in this case. That's the argument that I have for Your Honor.

I would turn it over to my client if he wants to make an allocution statement. He is a man of few words. So I don't know.

THE COURT: Again, delighted to hear from anybody. Mr. Uscanga is not penalized if he chooses not to speak, but he is free to speak if he wishes.

MR. MAYBERRY: Your Honor, he would like to make a statement.

THE COURT: You can just stay seated, Phillip. And just pull that mic right to you.

DEFENDANT USCANGA: Your Honor, I know I have made many mistakes in my life. And I know I can't go back on what has happened or what I have done or what has been done, but I know that I was accused of many things and a lot of it wasn't true, and I had to take that and go with it. And I just -- all I ask is to be given another chance. I got four kids that are waiting for me. And I just want to get back to them and my family. I know I put them through a lot. And it hasn't been easy for none of us. And that's really all I have to say, Your Honor.

THE COURT: All right. I thank you very much.

1        MR. MAYBERRY:  There were some family members.

2        THE COURT:  All right.  Thank you.

3        THE WITNESS:  All right, Your Honor.  First, I would

4   like to begin with introducing myself.  I am the second oldest

5   of four children of Carlos and Maria.  I am also Phillip's

6   older sister.  Growing up we never went without.  And our

7   parents, you know, did what they could.  And our parents

8   separated when I was about 12 and Phillip 4.  The separation

9   was very hard on my father, and he worked anywhere from 16- to

10  18-hour shifts at Tropicana.  Me and my older brother took on

11  the responsibility of taking care of Phillip in the absence of

12  both of our parents.

13        As time passed, I went to college, the only one of

14  four, married, started my own family.  My younger sister,

15  Ashley, had a child at 15.  The father of that child was

16  murdered at 21.  My brother John joined the military and also

17  started his own family.  As all these events unfolded, Phillip

18  became an immense support in more ways than one.

19        In 2007, I began my employment with the Twelfth

20  Circuit State Attorney's Office which paved my way into my

21  career choice.  During this time I worked full-time and

22  attended the University of South Florida, and Phillip baby-sat

23  my oldest daughter Jasmine.  I graduated in 2009 with a

24  bachelor's degree in criminology.

25        In 2010, two children later and new employment of

supervised release for the Twelfth Circuit in Sarasota, me and my husband decided to separate. During this time, my new employment required me to work 12-hour shifts overnight. To make matters worse, I had to move and I needed to find some kind of help so I could continue my employment.

So what did I do? Phillip at the age of 16 moved in with me. He stayed and helped me with my two children. So while I worked these 12-hour shifts, he made sure my kids went to bed, and he also helped me prepare when I arrived at 6:00 in the morning. And I made sure that everyone made it to school every day.

Phillip knew that in my house there were rules and more rules than at my parents' home. I won't sit here and say that he abided by every rule, but the majority of the time he did. He knew that he had to go to school. He knew that I didn't like, you know, his friends coming over. And this wasn't easy for a 16-year-old kid to take care of two children that were 2 and 4.

Phillip is far from perfect, but I also can't help to take some kind of responsibility for what brings us here today. After some time I found myself in a new relationship and Phillip moved back in with my parents. I feel like if I would have continued to check on him and made sure that he still stayed on the straight and narrow and was on him more, we wouldn't be here today.

For almost 14 years I have been on the other side of the justice system.  Today I ask you for leniency.  Phillip has four children, one who he has not seen since she was about one month old.

When I started my career path, I didn't really look in people for second chances.  Now that I'm a senior probation officer and I have contact with all sorts of individuals, few that I assume would return numerous times that I've been proven correct, I find myself changing my mind.  Why have I changed my mind?  Well, because now I have firsthand experience.

When all this happened, I was walking out of the doctor's office and I received a phone call from my boss.  He left me a message and he tells me in that message, "I need you to call me.  Your brother just hit the newspaper."

Not only was I embarrassed, I was overcome with disbelief because Phillip knows how I feel about those kinds of situations.  He knows my train of thought.  He knows that I don't take that kind of stuff and I won't accept that kind of stuff.  Phillip had no prior criminal history.

This has been a difficult time for myself and the rest of my family.  He has missed birthdays, holidays, graduations, countless other family events.  It's been almost two years, and it's been a huge impact.  Again, I have had several contact with several individuals, and I want to give

you an example of one person that I have come in contact that
has also helped me kind of change my mind.

This individual, his name is Elesar.  Elesar was
probably around the same age, 19 years old.  I first met
Elesar doing home visits as part of the SRT team in our
office.  Elesar was on probation for possession of marijuana.

During this home visit, Elesar comes to the door.
Elesar is probably about 130 pounds.  He opens the door, his
pants below the waist, boxers hanging out, towel wrapped
around his neck.  I take one look at him and I'm looking at
this kid like are you serious?  You're opening the door like
this?  And I look at him and I say to him, Elesar, pull up
your pants, man.  Nobody wants to see that.

He looks at me, does as I ask him to do and we head
towards his bedroom.  In his bedroom, his girlfriend is
sitting on the bed.  There's blunt wrappers everywhere.  I
look at him and I tell him, "What's this?  What am I looking
at?"  I was, like, "You do know I can take you back to jail
right now."

And he's, like, "Oh, no, no."

I said, "You know what?  You should call your
officer."

As we head out, the law enforcement officer that was
accompanying us looks at him and says, "What's that?"

And he's, like, "What?"

What's that in your car?"  He's got gang
paraphernalia all in his car.

I look back at him and I tell him, I said, "You know
what that's going to get you?"  He's got a blank stare.  I
said, "Nothing but trouble."  I said, "You think that those
are your friends?"  I said, "At the end of day, those friends
aren't even going to be there for you."  I said, "Your only
friend is yourself."

We leave that day.  I don't think much of it.  I
said, he'll be back.  I'll see him again.  I kid you not, not
even six months later he's back.  What's worse, he's back for
robbery with a firearm.  When I see Elesar, I say to him, "Do
you remember me?"

He's like, "Yeah."  And he puts his head down.

I said, "Do you remember what I said to you?"

And he's, like, "Yes."

I said, "Where are your friends now?"  And he
continues.  I told him, I said, "If you get out of this one,"
I said, "don't take for granted that you're given a second
chance," I said, "because you're not always given second
chances."

I see Elesar a few more times in and out of court,
not just for his robbery but also for his VOP.  During one of
these hearings, the state is arguing reasons for keeping him
in.  The judge on the bench isn't agreeing with the state and

allows the state to come back the next day with more proof.
And the judge tells the state that if they can't provide that
information, that he's going to be released the next day.

To Elesar's misfortune, the judge on the bench the
next day is not the same judge. When he sees that, he's
distraught. You see it on his face. The judge calls him up
to the podium, asks the state and the PD why is he returned.
No one has an answer.

I look at Elesar and I say -- and I find myself
walking up to the podium and I address the Court. And as an
officer of the court, I tell the judge what happened the day
prior. Elesar is released on supervised release.

I tell Elesar when court is over, I said, "I'll help
you out once, but after that you're on your own." I remind
him again that second chances are rarely given and not to take
this for granted.

He thanks me and he tells me that he's not coming
back. And I remind him that I've heard this many times. And
he nods his head that, no, he's not coming back.

And you're probably asking why I'm telling you this
story. I'm telling you this story because as I started my
career, I was on the other side. I always thought a criminal
is a criminal; they're not going to change. But as I find
myself here, there are some individuals that deserve that
second chance.

And just like Elesar, Phillip deserves that second
chance.  I know that from the day that he has been gone until
today, he has made a drastic change.  And just like Elesar,
he's going to do what he has to do to not come back, and he's
going to take those steps and show us, all of us and the
justice system that there is hope, that people do change.

And by far, I don't minimize his actions, but the
justice system is not just built on punishment.  It's also
built on rehabilitation and it allows us to give certain
individuals the opportunity to turn their lives around and to
prove to those like me at one point that criminals do change.

Thank you.

THE COURT:  Well, thank you very much.  I appreciate
that.

THE WITNESS:  Good morning, Your Honor.

THE COURT:  Yes, ma'am.

THE WITNESS:  I would just like to say that --

THE COURT:  You have got to give her your name,
please.  I'm sorry.

THE WITNESS:  Ashley Uscanga.

THE COURT:  Thank you, Ashley.

THE WITNESS:  I'm here today to kind of just give a
brief about us, our family.  We are five kids, three sisters,
two brothers.  And like my sister said, when we received the
news, the indictment and stuff, we were all in disbelief

1　because that's not how we have been brought up.  That's not

2　the type of people that we are.  I myself -- me and Phillip

3　are the youngest, but we are the closest.  He's like my best

4　friend.  So I know a lot about him and knew that when it came

5　to the stuff that was in there, it wasn't true.

6　　　　　My dad has worked his whole life.  We always were

7　like the spoiled ones when it comes to me and him.  So we have

8　never had a need to do, you know, things that -- yeah, he

9　probably made some bad choices, but...

10　　　　So I have three daughters.  My oldest one, her

11　daughter [sic] passed away when she was one.  And the second

12　one, her dad isn't in the picture either.  So when it comes to

13　my kids, my sister who is -- well, she is 16 and her father

14　hasn't been in her life either -- Phillip is the one we look

15　to as the male role model, the father figure, the one that if

16　there's a father-daughter dance, who's going to go?  Well, my

17　dad, he works all the time.  He works at Tropicana, works long

18　hours.  Phillip is always available, father-daughter dances,

19　father day breakfast.  If it's doing homework with the kids or

20　if I'm working, hey, I can't pick up the kids.  Will you pick

21　up the kids?  We know Phillip is the one that's always going

22　to be there when we need him to be there.

23　　　　Same with his kids.  You know, he is very hands on.

24　We are all a very close family and really hands on when it

25　comes to the kids.  That's pretty much it.

Like, it's just he's a good person.  He has got a
good heart, and it shows in the way that he is and the way
that we have been brought up and the fact that we can rely on
him for anything or whatever we need.  If I need my yard cut,
hey, come cut my yard.  He doesn't ask for anything in return.
You know, maybe if I'm cooking a meal, are you cooking, are
you cooking, whatever.  My yard cut, oil change, hey, you want
to come wash my car, will you wash my car, he's the go-to
person when anyone needs anything done.

I think that's all I've got to say.

THE COURT:  Thank you very much, Ashley.

THE WITNESS:  My name is Barb Lokonik, Your Honor.  I
have known Phillip since the day he came home from the
hospital.  I have watched him grow.  He's been my neighbor, my
friend.  He has done so many things for me I can't even begin
to recall or count how often he has come over and helped me.
He has been there when I lost my husband when he passed away
and there were things that I could no longer do.  Phillip was
right there to pitch in and do them for me.  He's just been
like a grandson to me.  I do not have any grandchildren, and
he's just been like a grandson to me, as his brother and
sisters have been like grandchildren to me.  And I'm very,
very fond of him.  And I certainly hope that things will turn
around.  He has learned from this experience.  It has not been
a good one, but I hope he has learned from it and that we can

now go ahead and go forward with our life and make something

of ourselves.

Thank you.

THE COURT: Well, thank you very much, ma'am.

THE WITNESS: Good morning, Your Honor.

THE COURT: Good morning.

THE WITNESS: I'm Tracy Soto. I'm Phillip's younger

sister. I'm the youngest one of five. The four of them have

the same mom and dad. Well, we all have the same mom, but I'm

the only one that has a different dad. And my dad has never

been there, never, not one day. And that actually had hurt

me, well, has hurt me a lot since growing up because I used to

see other little girls with their dads or something or

father-daughter dances at school and I didn't have that, but

Phillip was there. Phillip was that father figure for me. He

was always there when I needed him.

School supplies, he was the one that took me to

always get my school supplies every year for school. New

shoes, Phillip. New clothes, Phillip. When I had a problem

at school, somebody was bullying me or something, Phillip was

there for me. And he always comforted me and he gave me that

feeling of protection that I never had from another male

figure that I guess you could say I was looking for. I always

wanted a father, never had one, but with him I felt like I've

had one.

1      Phillip is just an amazing person, caring, loving.

2 There's not one time where I haven't needed -- there is not

3 one time where I've needed him and he hasn't been there.  Not

4 one time.

5      Phillip, he's the one that keeps our family together

6 really.  He is the one that's always on top of everybody.  He

7 is on top of me about my grades.  My grades, I always have to

8 have them up.  He's just an amazing person.

9      He's changed a lot, yes, but I just hope you give him

10 the chance that he deserves, Your Honor.

11      THE COURT:  Thank you for your comments.  Thank you.

12      THE WITNESS:  Hello, Your Honor.

13      THE COURT:  Yes, sir.

14      THE WITNESS:  My name is Mike Baganavich, and I have

15 known Phillip ever since he was born.  I live right across the

16 street from Barbara who has already testified.  But I miss him

17 because my roof needs cleaned on my house.  I have got a metal

18 roof.  He is the only one who has cleaned it since I put it

19 on.  And he has always done stuff.  When Irma came through, he

20 had the wood, put all the wood up for me on my house, didn't

21 say anything about paying him anything.  He has always been

22 like that.  He has done yardwork for me.  And he is -- I miss

23 him.  I really do.  Barbara does too.

24      I couldn't believe, you know, what's going on right

25 now, why he is still going through this.  And again, I'm here

1 for him.  I will be there for him when he comes home.  I will

2 just make it short and sweet.

3          Thank you.

4          THE COURT:  Well, thank you.

5          THE WITNESS:  Hello.

6          THE COURT:  Yes, ma'am.

7          THE WITNESS:  My name is Violet Lazo.  I'm the mother

8 of our two sons.  I have known Phillip for quite some time.

9 It's going to be like ten years.  I met him at the age of 15

10 and ended up living with him from the age of 15 until I want

11 to say a couple years ago, since this happened.

12          Throughout all the years that I've known Phillip, I

13 got to experience and we got to actually grow together.  So I

14 know and I have seen the process that he has grown into, the

15 adult that he has become now.  He became one of -- well,

16 actually he isn't the main support system.  He became one of

17 my support systems because I know what it's like not to have

18 either one of my parents.  Phillip, since the time that I met

19 him, he's always been there.  You know, he never -- everything

20 that I needed, not once did I not have nothing.  Neither did

21 our kids.  That's something that, you know, I'm very grateful

22 throughout the years that I got to know him that he's always

23 been there, a genuine person, you know, caring, loving, funny,

24 one of my -- he became, like, my best friend.  And I know the

25 gravity of the situation.

1    But all in all, Phillip, just the person that he is,

2    not just like teaching us -- mostly everything that I know, I

3    know because of him.  You know, not just as a mother, you

4    know, and a woman as well, the advice that he has given me,

5    not just him.

6        Like when he left, when we lost him, because I did,

7    not just me, my sons, my sons lost him, and it's been very

8    hard not just for me but for them because they had -- imagine

9    going from knowing somebody and then not having them.  You

10   know, it's hard.  It's a struggle because, like I said, I

11   didn't have -- I wasn't fortunate to have either one of my

12   parents.  I know what it's like because my father was

13   incarcerated.

14       You know, this is not something that I want for my

15   kids and especially knowing the person that Phillip is,

16   knowing the father that he is, you know, even now.  My kids,

17   it's affected them academically.  It has affected them

18   emotionally not having their father, having to see him through

19   a screen.  You know, it's not something that I would have ever

20   imagined my kids having to go through, especially knowing how

21   Phillip is, you know, knowing his heart, knowing his

22   personality, knowing the relationship that he had with not

23   just me, not just the kids, with everybody who knows him.  You

24   know, he left an impact on everybody that he knows.

25       And in the time that he's been gone, it just goes to

1   show how much of an effect that it's caused, not just, like I

2   said, for me or my kids or for -- you know, it's different.

3   You know, you can see the big effect that he had on every

4   single one of us.

5           I just hope that you guys can see the good side, who

6   he is through everybody that's speaking and for him to have a

7   chance, not just to be here but to be here and continue to be

8   the father figure that my sons need in their lives.  Nobody

9   else is going to be able to be there the way that he can.

10  Nobody else is going to be able to give them the advice.  You

11  know, you can get advice from people, but when it comes from

12  that man, that point, you know, I want that for my kids.  My

13  kids, not only do they want it, they need that.  That's their

14  father.  And I want him to be able to grow up and be able to

15  be there for them and give them the advice that they need, be

16  their friend, just how he was before everything that happened.

17          So, you know, I just hope that you guys see, you

18  know, everything that we are saying and he gets a chance to

19  come out and take his part as a father again and be there for

20  my sons, our sons.  I just want to thank you for the

21  opportunity for letting me be able to come up here and speak

22  on behalf of Phillip.

23          Thank you.

24          THE COURT:  Thank you very much.

25          What else, Mr. Mayberry?

1     MR. MAYBERRY:  I don't think there is any other

2 statements.

3     THE COURT:  All right.  Do you have any further

4 presentation for the defense?

5     MR. MAYBERRY:  I'm sorry.  One second.

6     I'm sorry.  We have one more.

7     THE COURT:  Of course.

8     THE WITNESS:  How are you doing?  My name is John.

9 I'm Phillip's older brother, if he can't tell my looking at

10 me.  I'm the older brother.  I always like to say I'm the

11 better looking brother just to differentiate us.

12     Between me and Phillip, there's two girls.  So for

13 me, he has always been my little brother, stuck to me like

14 bubble gum.  He leveled the playing field is the way I see it

15 because now we have two boys and two girls.  He always stuck

16 around me.  He has always been better at some things that I

17 haven't been at.  I was always better at school.  He was

18 always better more hands-on kind of person.  So if he needed

19 help with school work, I would help him.  If I needed

20 something fixed, like I can't fix my own car, I would always

21 go to him.  That would be my thing.  So if I needed help with

22 my vehicles or anything mechanical, even stuff around the

23 house, that would be stuff he would help me with.  He has

24 always been good with the kids, and I always see him as my

25 little brother.  That's all I have to say.

1          THE COURT:  Thank you very much.

2          Anything else, Mr. Mayberry?

3          MR. MAYBERRY:  No, Your Honor.

4          THE COURT:  Have you concluded the defense

5     presentation?

6          MR. MAYBERRY:  We have, Your Honor.

7          THE COURT:  So the record is closed in Mr. Uscanga's

8     sentencing presentation.

9          And Mr. Uscanga's objection to Paragraph 62 of the

10    PSR, I overrule that objection.

11         Now back on the record in Mr. Escoto's case.  I had

12    yet ruled on his objections to Paragraph 61.  As to

13    Paragraph 61, I sustain Mr. Sansone's objection.  And I will

14    have -- I will ask that Mr. Escoto's name in Paragraph 61, it

15    is there three times, just simply be deleted.

16         Does that cover the objection on 61, Mr. Sansone, if

17    we take Mr. Escoto's name out of that paragraph?

18         MR. SANSONE:  Yes, Your Honor.

19         THE COURT:  So I have ruled on all the objections.

20    Now I have heard everything that both defendants have to say.

21    So I'm going to pass sentence now.

22         Let me say this much.  This is a horrible case, okay?

23    This group that hung out at this house, we had six homicides.

24    I was a criminal defense lawyer for 35 years, longer than

25    Sansone and Mayberry maybe put together.

1       At the federal prisons, I have been to many of them,

2   many visiting rooms.  You come in.  You can sit down and the

3   loved one, in this case the brother, you can embrace.  You can

4   hug your brother.  Okay?  If Julio's sister wants to hug her

5   brother, she can go hug a tombstone.  She can give that

6   tombstone a nice hug.  You all are going to be able to hug

7   your brothers.  She is going to go to the graveyard and hug

8   hers.

9       So I'm sorry.  This sentence is not going to please

10  anybody.  But pursuant to 3551 and 3553, it's the judgment of

11  the Court that both of you defendants, Mr. Uscanga and

12  Mr. Escoto, are committed to the custody of the Bureau of

13  Prisons for a term of 144 months.  That's an upward variance,

14  and I'll state the grounds for it now.

15      Even viewing the facts as your lawyers want them

16  viewed, accepting the defense version of facts, you are

17  accessories after the fact to murder.  To murder.  The man was

18  murdered, okay?  Even viewing the facts as your lawyer

19  presented them, it was either a second degree murder or a

20  felony murder, and you were at a minimum accessories after the

21  fact.

22      Mr. Mayberry offered a set of facts where Johnny

23  Cintron was going to -- the trip in the red Mustang was to go

24  kick their rear end and have a fist fight, ended up a gun

25  fight.  Okay.  Well, that's felony murder.

1    When you go to commit an agg. assault and you end up

2 killing someone with a gun, it's a felony murder.  And this is

3 one of six dead bodies from this group that lived or hung out

4 at Jordan Rodriguez's house.  So if anybody takes any message

5 here, tell those people in that neighborhood all this stuff

6 has got to stop.

7    Three years of supervised release.  While on

8 supervised release, you will comply with the mandatory and

9 standard conditions in this district, and the following

10 special conditions:  Number 1, for all three years of your

11 supervised release, you will have a curfew of midnight to

12 6:00 a.m., and that may be monitored by electronic monitoring

13 by the probation office if they choose.

14    As long as your children are minors, you will support

15 them, not to -- at a level ordered by probation, not to exceed

16 25 percent of take-home pay.

17    You will have a verifiable full-time job, not off the

18 books, on the record, taxable, the entire time.  You will

19 serve during the three years of supervised release 150 hours

20 of community service.  You will participate in a substance

21 abuse program, out-patient or in-patient, and follow the

22 probation officer's instructions regarding the implementation

23 of this court directive.  You will have to contribute to the

24 cost of these services, not to exceed an amount determined

25 reasonable.

You will have to participate in a mental health program and follow the probation officer's instructions regarding the implementation of this court directive. Further, you will contribute to the cost of these services, not to exceed an amount determined reasonable by the probation officer's sliding scale.

Search.  You will have to submit to a search of your person, residence, place of business or storage units under your control, computer or vehicle, conducted by the probation office at a reasonable time and in a reasonable manner based upon reasonable suspicion of contraband or evidence of violations of conditions of release.  Failure to submit to a search will be grounds for revocation.  You will have to cooperate in the collection of DNA as ordered by probation.

No unlawful controlled substances.  You will have to submit to one drug test within 15 days of placement on supervision, at least two periodic drug tests thereafter as directed by probation.  Zero tolerance for all marijuana use, including recreational or medicinal.  Random drug tests not to exceed 104 per year.

There is no restitution.  The fine is waived.  There are no forfeiture matters.  There is a $100 special assessment.  Pursuant to 3553(a)(1) through 7, I have determined the sentence is sufficient but not greater than necessary to comply with statutory purposes of sentencing.  I

have accepted the plea agreement because I'm satisfied --

actually I didn't think the plea agreement was particularly,

given the nature of this thing, but I have accepted it because

I will not undermine the statutory purposes of sentencing.

Under the plea agreement, you have entered a plea to

Count 7 in exchange for dismissal of 1 and 3 through 6, and

those are dismissed.

Having pronounced sentence, I know that the defense

disagrees with the sentence based on substantive and

procedural upward variance.  By the way, the 5K motion, in

light of my variance, is moot, is denied as moot because I

have varied upward.

Beyond those objections already stated, does

Mr. Sansone have any of those you need to put on the record?

MR. SANSONE:  Nothing additional than already has

been stated, Your Honor.

THE COURT:  And your record is fully preserved as to

the variance.

Mr. Mayberry, any objections beyond those already

stated?

MR. MAYBERRY:  Same objections as before, Your Honor.

THE COURT:  All right.  And I will let the defendants

know that I will appoint these lawyers as counsel for you if

you have an appeal to the extent permitted by your plea

agreement, but remember the notice of appeal has to be filed

1    within 14 days.  And I will declare you indigent for purposes

2    of a filing fee and for your assistance of counsel.

3            You're remanded.  I will list on the judgment that I

4    would urge the Bureau of Prisons to give you the lowest

5    custody level appropriate.

6            Anything else from the defendants?

7            MR. SANSONE:  No, Your Honor.

8            THE COURT:  Government?

9            MR. MURRAY:  No, Your Honor.

10           MR. MAYBERRY:  Your Honor, one thing for Mr. Uscanga.

11   I think there is a keep separate between these two.  I don't

12   know that they necessarily want that.  Is there a way to lift

13   that?

14           THE COURT:  I'm sorry.  They are in the hands of the

15   Bureau of Prisons now.

16           (Proceedings concluded at 11:15 a.m.)

1  UNITED STATES DISTRICT COURT    )
                                   )
2  MIDDLE DISTRICT OF FLORIDA      )

3
                  **REPORTER TRANSCRIPT CERTIFICATE**
4
        I, Tracey Aurelio, Official Court Reporter for the United
5  States District Court, Middle District of Florida, certify,
   pursuant to *Section 753, Title 28, United States Code*, that
6  the foregoing is a true and correct transcription of the
   stenographic notes taken by the undersigned in the
7  above-entitled matter (Pages 1 through 76 inclusive) and that
   the transcript page format is in conformance with the
8  regulations of the Judicial Conference of the United States of
   America.

9

10                                  /s    *Tracey Aurelio*
                                    _____
11                                  Tracey Aurelio, RMR, RDR, CRR
                                    Official Court Reporter
12                                  United States District Court
                                    Middle District of Florida
13                                  Tampa Division
                                    Date:  April 14, 2020
14

15

16

17

18

19

20

21

22

23

24

25